MUTUAL LIFE INS. CO. OF NEW YORK *v.* HUGHES.

1. INSURANCE—CHANGE OF BENEFICIARY—MENTAL CAPACITY.
   In determining whether one insured under a life insurance policy has sufficient mental capacity to effect a change of beneficiary, the same rules are applicable as in the case of a bequest or deed.

2. INTERPLEADER — INSURANCE — CHANGE OF BENEFICIARY — MENTAL CAPACITY—EVIDENCE.
   In insurer's interpleader suit to determine whether $7,901.78, proceeds payable under policy, should go to wife of insured, named as beneficiary and with whom insured had lived for 37 years but who had left him about three months before his

death after he had struck her severely several times when she sought to interfere with his continued excessive consumption of intoxicating liquors, or to neighbor with whom insured lived less than two weeks before he died while suffering from delirium tremens, evidence *held*, to show that when form for change of beneficiary was executed a week before insured's death, he was in such a state of extreme mental and physical deterioration as to be wholly incompetent to effect a change of beneficiary under his policy.

Appeal from Cass; Warner (Glenn E.), J.   Submitted January 11, 1940.   (Docket No. 8, Calendar No. 40,772.)   Decided March 15, 1940.

Bill of interpleader by the Mutual Life Insurance Company of New York, a New York corporation, against Mary D. Hughes and L. Rex Curtis to determine to whom the proceeds of a life insurance policy should be paid.   From decree rendered for defendant Hughes, defendant Curtis appeals.   Affirmed.

*Carl D. Mosier,* for defendant Curtis.

*Arthur Abraham* and *Asa K. Hayden,* for defendant Hughes.

CHANDLER, J.   Plaintiff filed its bill of interpleader, praying that the court by its decree determine to whom the proceeds of a certain life insurance policy issued by it on the life of Davydd Hughes should be paid in view of the conflicting claims of defendants Mary D. Hughes and L. Rex Curtis.

The deceased was approximately 60 years of age at the time of his death, and had been married to Mary D. Hughes for 37 years, and for some five years prior to his death they had resided at Indian Lake, near Dowagiac.   For at least 30 years, he had indulged in the use of alcoholic beverages.   Efforts to abandon the habit by treatment failed, and for some

considerable period of time prior to his death on December 5, 1938, he consumed an average of a quart of bourbon whisky a day.

Prior to Labor Day of the year 1938, deceased and his wife had exhibited great affection toward each other. Mrs. Hughes had in the past attempted to exert her influence in an attempt to prevent him from drinking so heavily by limiting the quantity of whisky available. Deceased resented her interference, and his resentment finally culminated in a dispute on Labor Day, during which he struck her several times so severely as to require medical treatment. Thereafter, she went to Chicago to the home of a son, later informing deceased that she intended to stay there during the winter. Deceased had made threats on occasions that if she did return he would kill her.

Defendant Curtis was a neighbor of deceased and the latter had purchased dairy supplies from him during the time he had lived at Indian Lake. After Mrs. Hughes left, deceased resided alone until November 24, 1938, Thanksgiving Day, when he was invited to the home of Curtis to partake of Thanksgiving dinner. He accepted and was driven to the Curtis home in their automobile. He remained the balance of the day, and at evening when Curtis suggested that he was prepared to take him home, he expressed the desire to remain as he did not care to live at home alone. This was agreeable to Curtis and deceased remained in the home until his death. On the following day, at the request of deceased, Curtis went to his home and obtained certain personal belongings, including the insurance policy involved in this suit. Deceased showed the policy to the Curtises and remarked that Mrs. Hughes had taken his other two policies but had overlooked this one. The policy named Mrs. Hughes as beneficiary.

On the following Monday, according to testimony given in support of defendant Curtis' claim, Hughes again referred to the policy and stated to Mr. Curtis, ''Well, I want to make you a present of that.''. Mrs. Curtis testified:

" 'Well,' Mr. Curtis says, 'That is an awful big gift.' He says, 'I know it, but it is small pay, considering the way my folks have used me. They went and left me when I needed care, and they could just stay away. I don't want them notified even if I died.' "

It is claimed that deceased requested that Curtis obtain the services of a lawyer to effect a change in the naming of a beneficiary. Curtis obtained his lawyer, who, together with a stenographer, came to the Curtis place and deceased executed the form requesting that Curtis be named as beneficiary instead of his wife, his signature thereto being acknowledged by the stenographer as notary public. The form was forwarded by the attorney to the home office of the plaintiff company, but the actual change was never effected due to the fact that Mr. Hughes died and this controversy developed. Thereupon, the bill of interpleader was filed and the cause heard on the issue framed by the pleadings of the defendants.

The trial court entered a decree directing that the proceeds of the policy be paid to Mrs. Hughes for the reason that the request for a change of beneficiary was executed by the insured at a time when he did not have sufficient mental capacity to effect such a change legally. From this decree, defendant Curtis appeals.

Mrs. Hughes contends that the purported change in beneficiary is void for two reasons; namely, mental incompetency of the deceased at the time the request was executed, and undue influence claimed to

have been exerted by Curtis on deceased to induce him to make said change.

We are satisfied from a review of the entire record that the trial court correctly determined that deceased was mentally incompetent to legally effect a change in beneficiary of the policy on November 28th, and to confine our opinion to reasonable lengths will refer to only the more salient facts presented, in addition to those hereinbefore set forth, which lead us to this conclusion.

Dr. Lyman, who had examined deceased in a professional capacity on several occasions, testified that he suffered from a gradually increasing lack of nervous stability. He last saw Mr. Hughes in a nonprofessional capacity in the latter part of October, or early part of November, 1938, and observed, "at that time that he was decidedly swollen—his face, eyelids, hands, inability to lift one foot in the natural way of walking, and an exaggeration of the nervous symptoms—he was crying on the street while I was talking with him—it was much more marked than it was the last time I saw him. Of course physically I made no examination. That was observation, purely." He was of the opinion that Hughes was not mentally competent during November, 1938, to transact any business requiring the exercise of judgment, the reasoning faculties, and a consecutive continuation of thought, due to his condition as observed and the progressive character of his ailments.

Dr. Loupee, who had examined Hughes on three occasions, the last being on October 22, 1938, expressed a similar opinion, and stated that he did not believe him mentally capable of executing a simple legal document during November, 1938, such as a request for change of beneficiary in a policy of insurance.

From other witnesses, it was shown that in the fall of 1938, deceased cashed disability checks received from his insurance rather than depositing the proceeds thereof, because he was unable to draw checks accurately against his account; that he stated that if Mrs. Hughes ever returned he was "going to knock her head off;" that he stated on several occasions in the summer and fall of 1938, that he was the Prince of Wales, the direct heir to the Crown of England, that he was a great physician, having missed being elected president of the American Medical Association by a small margin, that he was an aviator and a licensed pilot, and that he had been a member of the Secret Service for five years. All of the statements had no foundation in fact. His son testified:

"In October of 1938 I observed relative to his physical appearance that he was puffing badly, his face was puffed badly, and his eyes, the puffs beneath his eyes extended far enough to touch his glasses; his eyes popped out and took on a glassy stare—he seemed to be looking up at something, trying to—rolling the eyes into the upper eyelids; swelling of the ankles; swelling of the feet. And when he laid down he would get hold of the end of the cot and the whole thing would shake so bad it would make so much noise, if we wanted to go sleep we couldn't."

Other testimony is to the effect that he became incoherent in his speech and was unable to maintain a continuous conversation on any one subject.

Deceased went to the Curtis home on November 24, 1938, and stayed there until his death on December 5th. He drank continuously until the following Wednesday, when he became unable to drink anything. The testimony varies as to the quantity of bourbon whisky he consumed during the five days

of drinking. According to the various estimates, he drank from 8 to 20 quarts of the liquor. The record does not show that any other person consumed any of his supply or that any remained after he became unable to continue. The debauch terminated on November 30th. Thereafter, delirium tremens developed, resulting in death. While at the Curtises he ate nothing but cold canned soup, with the exception of the Thanksgiving dinner.

Although it is claimed by defendant Curtis that deceased was in good condition on November 24th when he arrived, Mrs. Curtis wrote to Mrs. Hughes on December 4th the following:

"I received your letter and will let you know that Mr. Hughes came to our place Thanksgiving noon for dinner but couldn't enjoy himself very much as he could hardly stand on his feet.

"He intended to go back home that evening but felt so bad, that he has stayed here since.

"He has been in about as fine a state of 'delirium tremens' as a person could be and is in very poor shape now. We are giving him as good care as possible. Dr. Myers is giving him medicine and said his heart seems strong still he seems in very poor state of health, so we are hoping for the best."

The testimony in support of the claim of defendant Curtis was largely supplied by members of his immediate family.

In determining mental competency in this type of case, the same rules are applicable as in the case of a bequest or deed. *Grand Lodge A. O. U. W.* v. *Brown,* 160 Mich. 437.

We think that it clearly appears that on the day the request for change of beneficiary was executed, Mr. Hughes was in a state of extreme mental and physical deterioration. He was not a man of wealth,

possessing but two other insurance policies of $5,000 each and the small property at Indian Lake. He attempted to transfer the proceeds of this policy in the amount of $7,901.78, after deducting loans made thereon, to Curtis, a man with whom he had no intimate acquaintance, for a wholly inadequate consideration, to the exclusion of his wife of 37 years, for whom he had exhibited affection prior to a few weeks before his death.

In our opinion, it requires no discussion to find from the facts as related that Hughes was wholly incompetent to transfer the proceeds on this policy on November 28, 1938.

The decree is affirmed. Defendant Hughes will recover costs against defendant Curtis.

BUSHNELL, C. J., and SHARPE, POTTER, NORTH, McALLISTER, WIEST, and BUTZEL, JJ., concurred.